KARDO CO. v. ADAMS.

(Circuit Court of Appeals, Sixth Circuit. February 18, 1916.)

No. 2803.

1. COURTS ⬦⟳280—FEDERAL COURTS—DECLINING JURISDICTION.

The provisions of Judicial Code (Act March 3, 1911, c. 231, § 37, 36 Stat. 1098 [Comp. St. 1913, § 1019]), requiring a District Court to dismiss a suit if it appears that it does not really and substantially involve a dispute properly within the court's jurisdiction, or that parties have been improperly or collusively joined for the purpose of creating a case cognizable by that court, apply only where the matters so appearing affect the court's jurisdiction; and where the court has jurisdiction by reason of the subject-matter of the suit, as when it is one arising under the patent laws, jurisdiction of which is given by Judicial Code, § 24(7), being Comp. St. 1913, § 991, regardless of the citizenship of the parties, the court has no power, inherent or statutory, to make an inquiry sua sponte into the complainant's corporate capacity to sue when the defendant by pleading to the merits has waived that question.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 816–818; Dec. Dig. ⬦⟳280.]

2. COURTS ⬦⟳37(1)—JURISDICTION—CORPORATE CAPACITY TO SUE—WAIVER.

While jurisdiction cannot be conferred on a federal court by waiver or consent of a defendant, yet, in a case in which the nature of the right asserted confers jurisdiction, the want of complainant's corporate capacity to sue, which is an issuable fact, may be waived by him.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 147, 151; Dec. Dig. ⬦⟳37(1).]

3. EQUITY ⬦⟳117—PARTIES—CAPACITY OF PLAINTIFF TO SUE.

The provision of new equity rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii) that "every action shall be prosecuted in the name of the real party in interest," where jurisdiction appears from the nature of the suit, does not impose on a federal court the duty, on its own motion, without pleadings raising the issue, to inquire into the capacity of the plaintiff to sue.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 246, 285–292; Dec. Dig. ⬦⟳117.]

4. CORPORATIONS ⬦⟳28(1)—INCORPORATION—DE FACTO CORPORATIONS.

Under Gen. Code Ohio, § 8627, which provides that, "upon filing articles of incorporation, the persons who subscribed them, their associates, successors and assigns, by the name and style provided therein, shall be a body corporate, with succession, power to sue and be sued," etc., the filing of such articles, followed by the transaction of corporate business creates a corporation, at least de facto, for the purpose of suing or being sued, although the further provisions with respect to the issuance of stock and the election of directors have not been lawfully complied with.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 26, 70; Dec. Dig. ⬦⟳28(1).]

5. COURTS ⬦⟳368—FEDERAL COURTS—FOLLOWING STATE DECISIONS.

While the federal courts are required to follow the decisions of the court of last resort in a state in their construction of state laws, where such decisions are conflicting, the court will apply the rule of harmonizing them by attributing the declaration of law in a case to the facts in it, and denying its application to cases involving different situations and requirements.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 951; Dec. Dig. ⬦⟳ 368.]

---

⬦⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. CORPORATIONS ☞377(1) —POWERS—SUBSCRIPTION TO STOCK OF ANOTHER CORPORATION.

Under the law of Ohio, no fraud appearing, the representatives of a corporation may subscribe for it to the capital stock of another corporation caused by it to be formed by them.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1531; Dec. Dig. ☞377(1).]

7. CORPORATIONS ☞282—DIRECTORS—QUALIFICATION.

In the absence of fraud or a dishonest purpose, that a stockholder obtained his stock by gift, or holds it on a trust, does not disqualify him as a director.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1189-1194; Dec. Dig. ☞282.]

8. CORPORATIONS ☞29(1)—RULE AS TO DISREGARDING CORPORATE FORMS.

The rule that equity may disregard corporate forms cannot be invoked for the benefit of one who has done the corporation a wrong.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 77, 79; Dec. Dig. ☞29(1).]

9. CORPORATIONS ☞29(2)—DE FACTO CORPORATIONS—COLLATERAL ATTACK.

When the fact of the existence of a corporation de facto is established, its existence de jure cannot be attacked collaterally, but only by the state in a direct proceeding.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 78, 79, 2504; Dec. Dig. ☞29(2).]

10. CORPORATIONS ☞29(2)—DE FACTO CORPORATION—COLLATERAL ATTACK.

Three corporations, each the owner of patents covering parts of automobiles, capable of conjoint use, in order to better protect their rights under the patents, promoted the organization of a fourth corporation to hold title to the patents, to grant licenses, and to prosecute infringers. The incorporators did not intend to become, and did not become, beneficially interested in the corporation; but each subscribed for one share of stock, which was paid for. They elected themselves officers and directors, and afterward resigned, one by one, and elected in their places officers and directors of the promoting corporations, to whom they assigned their certificates of stock. The remaining stock was subscribed and paid for by such three corporations, which also paid for the stock issued to the incorporators and assigned their patents to the new corporation. The organization was in form in compliance with the laws of the state and was in good faith. Held, in a suit by the new corporation for infringement, that complainant was a corporation de facto, if not de jure, and that the legality of its organization could not be attacked by defendant.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 78, 79, 2504; Dec. Dig. ☞29(2).]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Suit in equity by the Kardo Company, substituted for the American Ball Bearing Company, against Henry J. Adams, dealing as Reo Motor Sales Company. From a decree dismissing the bill, complainant appeals. Reversed.

For opinion below, see 222 Fed. 967.

Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio (Edward R. Alexander, of Cleveland, Ohio, Edward Rector, of Chi-

cago, Ill., and Horace Andrews and Paul J. Bickel, both of Cleveland, Ohio, of counsel), for appellants.

Lawrence Maxwell, of Cincinnati, Ohio, and R. A. Parker, of Detroit, Mich., for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge. Three corporations, the American Ball Bearing Company, the Packard Motor Car Company, and the Peerless Motor Car Company, were each the owners of separate patents on equipment for the rear axles of automobiles. Their patents were of such nature that apparently, as found by the trial court, they "interlaced or overlapped one another, so that, if one company gave a license under the patent which it owned, complaints of infringements and threatened suits straightway arose from one or another of the other companies."

They thereupon, so that the ownership of all of the patents might be in one company, which, as owner, could grant licenses, thus saving uncertainty in dealing with the patents, and for the purpose of avoiding litigation between themselves, sought to organize a corporation of Ohio under the name of "The Kardo Company," with a capital stock of $1,000,000. Articles of incorporation were signed February 21, 1914, by five men in the employ of the law firm in charge of the organization, not connected otherwise than as attorney with any of the three companies. The articles were filed with the Secretary of State February 24, 1914. On the same day, each of the incorporators subscribed for one share of the capital stock, and one of them subscribed, as trustee for the American Ball Bearing Company for 995 shares, agreeing to pay $9,500 in cash and $90,000 by the transfer of patents by the American Ball Bearing Company to the Kardo Company. Ten thousand dollars, one-tenth of the $100,000 subscribed, were paid on the day of subscription by the American Ball Bearing Company, and the incorporators at no time paid any sum of money. Each of the other corporations paid in $10,000, the Peerless Company about the 1st of March, and the Packard Company about two weeks afterwards, so that each of the corporations paid in equal amounts; the $10,000 paid on subscription by the American Ball Bearing Company being for itself and the other two.

At the first stockholders' meeting, February 24, 1914, the five incorporators being present and voting as stockholders, a code of regulations and by-laws was adopted, in which it was provided that the board of directors should be five stockholders, a majority of whom should be citizens of Ohio. The same parties elected themselves directors, and at their meeting as such, 30 minutes later, four of them were elected officers, and adopted a proposed agreement between the three corporations, providing for the sale and transfer to the Kardo Company of the letters patent owned by each, respectively, for which each was to receive $200,000 of the capital stock, which agreement the incorporators, as stockholders, at a meeting held immediately, ap-

proved. February 27th, the same individuals called a special stockholders' meeting, and the regulations were amended to make the number of directors six, instead of five. On the same day, the directors met, and, as one after another resigned as directors and officers, their places were filled by officers and directors of the three corporations. As each resigned, the certificate for the one share he had subscribed was assigned to his successor, each of whom believed himself to be the owner of the share thus assigned to him, and kept it in his possession. So far as the record discloses, he was the owner. During the pendency of this suit, and after the question as to the propriety of the formation of the Kardo Company had been raised, each director, upon the advice of counsel, actually paid in money for the share thus transferred to him. All of the formal steps, notices, waivers and certificates strictly complied with the law. No salaries have been paid to officers. The bookkeeper of one of the corporations did such bookkeeping for the Kardo Company as was necessary. Its office is in the office of its local patent attorney. It has a seal. The evidence shows that, while it has granted no licenses on its patents, it has, nevertheless, earnestly tried to grant them, and it is fully equipped to carry on its business, and apparently has ample capital with which to carry it on.

The purpose of the incorporation, expressed in the articles of incorporation filed with the Secretary of State, was—

"purchasing, leasing, or otherwise acquiring, and of registering, owning and using inventions, improvements, trade secrets, processes, or interests therein, and applying for and receiving, purchasing, or otherwise acquiring, letters patent, or rights or interests in or under letters patent, for or upon motor and other vehicles, or means of transportation, and traction and propelling machinery, and for or upon the mechanism, parts or equipment of the same, or the tools or machinery for the manufacture of the same; and of selling, assigning, or granting licenses and rights under or in respect of such secrets, processes, inventions, improvements or patents, and otherwise dealing in respect of or with the same, or either of them; and of manufacturing, using and dealing in the vehicles, articles, machinery, equipment and parts covered by or provided for in said inventions, patents or improvements, and of doing all things necessary, proper and incidental to the transaction of said business, or any part thereof."

The bill of complaint was filed, June 25, 1913, by the American Ball Bearing Company, a corporation of Ohio. The defendant answered July 15, 1913, and amended its answer September 25, 1913. The bill was for infringement of a patent, of which the American Ball Bearing Company claimed to be the owner, for an accounting of profits, for treble damages by reason of the aggravated nature of the claimed infringement, and for the destruction of the alleged infringing mechanism in defendant's possession.

On October 20, 1914, the Kardo Company filed a bill in the nature of a supplemental bill alleging its corporate character and the assignment to it of complainant's patents and prayed to be substituted as complainant and for relief as prayed in the original bill. The defendant, January 25, 1915, filed a further amendment to its answer, but did not put in issue the validity of the Kardo Company's corporate existence under the laws of Ohio, nor did it in any way challenge the pro-

priety of its maintaining the suit, except by the "vague suggestions" referred to in the opinion of the trial court. 222 Fed. 967, 969.

[1] On the issues made by the pleadings, proofs were taken, and at the final hearing, the court, without considering the merits of the case, of its own motion, dismissed the bill on the ground that the Kardo Company had no corporate existence de jure or de facto, was not the real party in interest, and that its suit was a fraud on the jurisdiction of the court. The court did so on the theory, apparently, that a District Court of the United States has power, for the purpose of protecting its jurisdiction, to inquire, in all cases, of its own motion, into the steps taken by a complainant, alleging itself to be a corporation, through which it acquired the corporate character claimed by it. The action of the court in making the inquiry was based on his views of section 37 of the Judicial Code, equity rule 37, and of the inherent power in a court of the United States to protect its jurisdiction.

Original jurisdiction has been conferred by Congress by virtue of article 3, § 2, of the Constitution on the District Courts in many classes of cases, of which attention need be called to two:

"Of all suits of a civil nature, at common law or in equity, * * * where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of three thousand dollars, and * * * is between citizens of different states;" and "Of all suits at law or in equity arising under the patent * * * laws." Judicial Code U. S. § 24, subds. 1, 7.

The provision as to the sum or value of the matter in controversy, does not apply to patent cases. Section 24, subd. 1.

This suit arose under the patent laws, and the jurisdiction of the court to hear and determine the issues raised in it cannot be doubted.

Jurisdiction conferred by reason of diversity of citizenship is a different matter. In Cohens v. Virginia, 6 Wheat. *264, *393 (5 L. Ed. 257), it was said by Chief Justice Marshall:

"In one description of cases, the jurisdiction of the court is founded entirely on the character of the parties; and the nature of the controversy is not contemplated by the constitution—the character of the parties is everything, the nature of the case nothing. In the other description of cases, the jurisdiction is founded entirely on the character of the case, and the parties are not contemplated by the constitution—in these, the nature of the case is everything, the character of the parties nothing."

The court, therefore, had jurisdiction of the subject-matter, and it was immaterial, so far as jurisdiction is concerned, what the citizenship of the parties might be.

In 1875, Congress passed the law, now section 37 of the Judicial Code, providing:

"If in any suit commenced in a district court, or removed from a State Court to a district court of the United States, it shall appear to the satisfaction of the said district court, at any time after such suit has been brought or removed thereto, that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said district court, or that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this chapter, the said district court shall proceed no further therein, but shall dismiss the suit or remand it to the court

from which it was removed, as justice may require, and shall make such order as to costs as shall be just."

The purpose of the act was to protect the court and the parties against fraud upon its jurisdiction. It was so said in Williams v. Nottawa, 104 U. S. 209, 211 (26 L. Ed. 719):

"Congress was specially careful to guard against the consequences of collusive transfers to make parties, and imposed the duty on the court, on its own motion, without waiting for the parties, to stop all further proceedings and dismiss the suit the moment anything of the kind appeared. This was for the protection of the court as well as parties against frauds upon its jurisdiction. * * *"

See, also, Morris v. Gilmer, 129 U. S. 315, 326, 9 Sup. Ct. 289, 32 L. Ed. 690, and Mining Co. v. Kelly, 160 U. S. 327, 339, 340, 16 Sup. Ct. 307, 40 L. Ed. 444.

The first part of the section deals with jurisdiction over the subject-matter of the suit—the right asserted in it; the second part with jurisdiction dependent upon diversity of citizenship. Since the jurisdiction invoked in this case did not involve the citizenship of the parties, the court's inquiry could in any event only be directed to the question whether or not a substantial dispute or controversy was involved properly within the jurisdiction of the court. The phrase "within the jurisdiction" has been defined by the Supreme Court:

"It means, within the judicial cognizance—within the capacity to determine the merits of the dispute or controversy and to grant the relief asked for." Rosenbaum v. Bauer, 120 U. S. 450, 459, 7 Sup. Ct. 633, 637 (30 L. Ed. 743).

That this case was within the jurisdiction as thus defined, no doubt can be entertained.

This section has been applied to a number of cases, mostly involving jurisdiction based on diversity of citizenship or the amount in controversy; but we have found no decision in any of the courts of the United States or in any state court which recognizes power in a court to make inquiry, on its own motion, without pleadings, into the capacity of a corporation to sue in a case over which a court had jurisdiction by reason of the nature of the controversy.

Prior to the act of 1875, in cases dependent for jurisdiction on diversity of citizenship, when the proper allegations of citizenship appeared in the pleadings, a plea in abatement was necessary to raise the issue of citizenship. Farmington v. Pillsbury, 114 U. S. 138, 143, 5 Sup. Ct. 807, 29 L. Ed. 114; Little v. Giles, 118 U. S. 596, 604, 7 Sup. Ct. 32, 30 L. Ed. 269; Gilbert v. David, 235 U. S. 561, 567, 35 Sup. Ct. 164, 59 L. Ed. 360. That issue may now be raised by answer, by motion, or by any method appealing to the sound discretion of the court. Gilbert v. David, 235 U. S. 561, 567, 35 Sup. Ct. 164, 59 L. Ed. 360. Power for the court's independent inquiry did not exist under the decisions, even when the jurisdiction depended upon diversity of citizenship until section 37 conferred the power. If, without this section, power is not inherent in the court to protect, on its own motion and without pleadings, its jurisdiction in cases in which diversity of citizenship gave jurisdiction, even when fraudulently invoked,

it cannot be that such extraordinary power can be exercised for the purpose of determining the plaintiff's corporate capacity or the reality of its interest as a corporation in a suit of which the court has jurisdiction by reason of the nature of the right asserted. Jurisdiction of the courts of the United States in such cases does not depend upon the existence of such facts. In addition to the plain language of the statute conferring jurisdiction, a number of considerations are conclusive to the contrary.

It was said in Byers v. McAuley, 149 U. S. 608, 618, 13 Sup. Ct. 906, 910 (37 L. Ed. 867), by Mr. Justice Brewer:

"The jurisdiction of the Federal courts is a limited one, depending upon either the existence of a Federal question or diverse citizenship of the parties. Where these elements of jurisdiction are wanting, it cannot proceed, even with the consent of the parties."

And in Powers v. C. & O. Ry. Co., 169 U. S. 92, 98, 18 Sup. Ct. 264, 266 (42 L. Ed. 673), Mr. Justice Gray said:

"The existence of diverse citizenship, or other equivalent condition of jurisdiction, is fundamental; the want of it will be taken notice of by the court of its own motion, and cannot be waived by either party."

And yet it has been held time and again in the courts of the United States that the defendant must specially aver the plaintiff's corporate invalidity, and, if he pleads to the merits without doing so, he is held to admit plaintiff's corporate capacity. Conard v. Insurance Co., 1 Pet. *386, *450, 7 L. Ed. 189; Society, etc., v. Town of Pawlet, 4 Pet. *480, *501, 7 L. Ed. 927; Wickliffe v. Owings, 17 How. *47, *51, 15 L. Ed. 44; Philadelphia, etc., R. R. Co. v. Quigley, 21 How. 202, 214, 16 L. Ed. 73; United States v. Insurance Companies, 22 Wall. 99, 100, 101, 22 L. Ed. 816; Kenton Furnace Co. v. McAlpin, 5 Fed. 737, 741 (C. C.); Emerson v. Nimocks, 88 Fed. 280, 281 (C. C.). Whether or not, since the act of 1875, it is the duty of the district court to inquire of its own motion into the proper organization of a plaintiff corporation when the jurisdiction depends upon diversity of citizenship, we are not called on to decide, for that question does not arise in this case. But we venture to say no suggestion will be found in any of the cases that, when a corporation is a party plaintiff, the court has, irrespective of that act, inherent power, even in cases in which the citizenship of the parties is the test of its jurisdiction, to inquire into and determine the validity of the plaintiff's corporate existence when the defendant has waived the question by pleading to the merits.

It may be said, with certainty, that when the jurisdiction depends upon the nature of the right asserted, as in this case, the court has no power, inherent or statutory, to make an inquiry, sua sponte, into the plaintiff's corporate capacity when the defendant, by pleading to the merits, has waived that question. Pullman v. Upton, 96 U. S. 328, 329, 24 L. Ed. 818, decided October term, 1877, is directly to the point. An assignee in bankruptcy of a corporation sued a stockholder in the Circuit Court of the United States for the Northern District of Illinois to recover the balance remaining unpaid upon his stock. The bankrupt was a corporation of Illinois, and was decreed a bankrupt in the District Court for the Northern District of that state, the

assignee being appointed by that court. Jurisdiction was conferred by the Bankruptcy Act of 1867, and did not depend upon diversity of citizenship. On the trial the assignee offered in evidence and the court admitted, certain papers the object of which was to prove the existence of, the corporation and the increase of its capital stock; but this evidence was, in the Supreme Court, held to be immaterial, Mr. Justice Strong saying:

"But the existence of the corporation was admitted by the defendant's plea of *non assumpsit;* and whether the corporate stock had been properly increased was a question the State only could raise. It is well settled, that, in a suit by a corporation, a plea of the general issue admits the competency of the plaintiff to sue as such."

There are many decisions in the courts of the United States and in the state courts holding a defendant estopped to deny the corporate existence of the plaintiff. Some reference to them will be made hereinafter. The principle is found in the language of Mr. Justice Swayne in Casey v. Galli, 94 U. S. 673, 680 (24 L. Ed. 168) a case not depending for jurisdiction on diversity of citizenship:

"Where a shareholder of a corporation is called upon to respond to a liability as such, and where a party has contracted with a corporation, and is sued upon the contract, neither is permitted to deny the existence or the legal validity of such corporation. To hold otherwise would be contrary to the plainest principles of reason and of good faith, and involve a mockery of justice."

Is it possible that when plainest principles of justice estop a defendant himself from denying the corporate capacity of the plaintiff to sue, and that, too, when he pleads to that end, the court may, of its own motion, when the subject-matter of, the suit is the basis of its jurisdiction, inquire, without pleadings, into the plaintiff's capacity, and, if not satisfied, dismiss the bill?

[2] It is clear that while jurisdiction cannot be conferred by waiver or consent of a defendant, yet, in a case in which the nature of the right asserted confers jurisdiction, the want of corporate capacity to sue may be waived by him. The question is not one of jurisdiction. Jurisdiction is exercised through and upon the issues in the case. Jurisdiction is a matter of power. The issues are determined through the exercise of the power. The jurisdiction of the court and the issues to be tried, are quite distinct. It was said by Vice Chancellor Pitney, in Union Water Co. v. Kean, 52 N. J. Eq. 111, 122, 123, 27 Atl. 1015, 1019, in dealing with collateral attacks on de facto corporate existence in the course of an ordinary suit at law:

"The real ground and reason of the decisions in the line of cases now under consideration, is the lack of a complaint on the part of the proper and only party who has a right to complain, viz., the State, and not the want of capacity or ability in either court to deal with the question involved. In short, the power of this court to deal with any matter brought before it does not depend upon the nature or character of the *issue* to be tried or question to be determined, but it depends upon the *nature of the right* to be administered and enforced, and the *character of the remedy* necessary or appropriate to its enforcement. If the right to be enforced be one properly cognizable by a court of equity, and the remedy necessary to enforce it be such as only a court of equity can administer, then a court of equity has jurisdiction, and the circumstance that, in the course of its administration, it has to deal with

questions of law and fact, of whatever nature they may be, does not stand in its way."

The complainant's corporate capacity was an issuable fact. Issues are brought before a court by the pleadings, and its decrees must be considered in connection with the pleadings. Barnes v. Chicago, etc., Ry. Co., 122 U. S. 1, 14, 7 Sup. Ct. 1043, 30 L. Ed. 1128; Graham v. La Crosse Railroad Co., 3 Wall. 704, 710, 711, 712, 18 L. Ed. 247; Reynolds v. Stockton, 43 N. J. Eq. 211, 10 Atl. 385, 3 Am. St. Rep. 305; Munday v. Vail, 34 N. J. Law, 418, 423, 424; Carter v. Gibson, 47 Neb. 655, 66 N. W. 631; Maddox v. Summerlin, 92 Tex. 483, 488, 49 S. W. 1033, 50 S. W. 567; Spoors v. Coen, 44 Ohio St. 497, 502, 503, 9 N. E. 132. This is elementary. Waldron v. Harvey, 54 W. Va. 608, 613, 46 S. E. 603, 102 Am. St. Rep. 959.

Under the pleadings in this case, the questions of the corporate invalidity of the Kardo Company and of the reality of its interest, were not issues to be tried.

[3] While that part of, equity rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii) taking effect February 1, 1913, providing that "every action shall be prosecuted in the name of the real party in interest," is not found in any previous equity rules made by the Supreme Court for the guidance of courts in equity cases, yet it is but the declaration of a rule in equity cases in the courts of the United States, which by statute of Ohio and generally in states which have adopted a code of civil procedure, prevails, and which, in cases at law, the courts of the United States follow. It is clear, therefore, that when the nature of the suit is such as to show that it really and substantially involves a controversy within the capacity of the court to determine and grant the relief asked, and no question of, citizenship, upon which jurisdiction is based, exists, the case presents no peculiar feature imposing on a court of the United States the duty, on its own motion, without pleadings, of inquiring into the question of the capacity of the plaintiff to sue. Under such circumstances, the case is no different from any other case in any court having jurisdiction of the subject-matter under the practice prevailing in the United States.[1]

In Ohio this provision is found in section 25 of the Code of Civil Procedure, taking effect January 1, 1853 (Section 11241, Gen. Code Ohio):

"An action must be prosecuted in the name of the real party in interest. * * *"

Nevertheless, it is the rule in that state that a corporation commencing an action need not state that it is a corporation, and if it does so, it will not, even upon a general denial, be required to prove that it is a corporation. If the defendant desires to raise that issue he must plead it. Methodist Episcopal Church v. Wood, 5 Ohio, *283, *286; Smith v. Weed Sewing Machine Co., 26 Ohio St. 562, 565; Brady v. National Supply Co., 64 Ohio St. 267, 60 N. E. 218, 83 Am. St. Rep. 753.

[1] The same conclusion will be found in Editorial Notes, Columbia Law Review, vol. XV, No. 8, December, 1915, pp. 706, 707, 708.

The right asserted in the bill properly invoking jurisdiction of the court, there is no reason why the issue of the capacity of plaintiff to sue should not be raised by defendant's answer, if a defendant desires to raise the question, and, when raised, tried in the usual way.

We think the court was in error in making the inquiry and in dismissing the bill. Assuming, however, that since the facts have appeared the defendant may amend his answer, if he desires to do so, or, if he does not, that the court has power to direct him to do so, under the liberal provisions of section 1591, 1 U. S. Comp. Stat. 1913, p. 675, we proceed to determine the question, whether or not the Kardo Company was clothed with sufficient corporate capacity to permit it to maintain against an alleged wrongdoer an action relative to a subject-matter within the jurisdiction of the court. The motives of the incorporators were legitimate; their purposes and the purposes of the three corporations for whom they were acting, were laudable, and it cannot be denied that the purposes expressed in the articles of incorporation were, in all respects, lawful.

No injury or fraud was perpetrated, or sought to be perpetrated, and the claimed invalidity of the incorporation rests upon the facts that three corporations promoted the formation of another corporation; that the incorporators did not intend themselves to become, and did not become, beneficially interested in the stock or in the corporation to be formed; that they; not being actual owners of stock, could not be directors; and that the directors substituted for them were not legally elected, paid nothing for their stock and were not, therefore, bona fide holders.

From these the deduction is drawn that the Kardo Company was a "dummy" company, its directors "dummy" directors, and that, therefore, a court of equity would look through the form of things to their substance and declare nonexistent that which appeared to exist, whatever the consequences might be, and regardless of the wrongdoing of the defendant as alleged in the bill.

[4] Section 8627, Gen. Code Ohio, provides:

"Upon filing articles of incorporation, the persons who subscribed them, their associates, successors, and assigns, by the name and style provided therein, shall be a body corporate, with succession, power to sue and be sued. * * *"

In Ashtabula, etc., R. R. Co. v. Smith, 15 Ohio St. 328, 334, the statute was construed, and it was there held, Judge White writing the opinion, that the general powers conferred—

"fall into two classes: such as may be exercised before, and such as can not be until after, the election of directors. Among the former is the right to receive subscriptions to the capital stock, and, when ten per centum of the amount shall be subscribed, to elect directors. * * * After the election of directors all the business of the corporation is to be transacted by them, or under their authority; but, the existence of the body corporate does not depend upon the election of, or the right to elect, directors."

In Powers v. Hazelton, etc., Ry. Co., 33 Ohio St. 429, 432, a suit by a railroad company to condemn land for the construction of its road, the court followed the decision in the other case on this point,

and held, however, that the condemnation of land was a power which could only be exercised by the corporation through its directors. It was said by Judge Day:

"It was therefore incumbent on the company to show, in addition to the fact of its incorporation, that it had brought itself into a condition to exercise its powers for the construction of the read, by a full organization in the election of directors."

See, also, State ex rel. v. Robinson, 9 Ohio Dec. 383, 12 Wkly. Law Bul. 269.

In Union Water Co. v. Kean, 52 N. J. Eq. 111, 141, 27 Atl. 1015, 1026. Pitney, V. C., quoted with emphasis from Judge Bennett's opinion in Railroad v. Clayes, 21 Vt. *30:

"It is the statute which creates the subscribers for stock a corporation and not their organizing under it."

In Wells Co. v. Gastonia, etc., Co., 198 U. S. 177, 25 Sup. Ct. 640, 49 L. Ed. 1003, it appeared that the charter of a corporation of Mississippi provided that the incorporators "are hereby created a body politic and corporate," and also that "as soon as ten thousand dollars of stock is subscribed and paid for said corporation shall have power to commence business." The $10,000 were not paid, but the corporation after doing business, sued a citizen of North Carolina in the Circuit Court for that state for goods sold. It was held that the subscription and payment of the required amount of capital stock were not such conditions precedent that the corporation did not exist until payment of subscription; that the corporation was created when its charter was approved and the great seal of the state affixed to it and was entitled to sue as a citizen of Mississippi. To the same effect, Frost v. Coal Co., 24 How. 278, 16 L. Ed. 637.

In Ohio, after the decisions referred to, it seemed settled that the filing of the articles of incorporation creates a body corporate as the statute says, but in State ex rel. v. Insurance Co., 49 Ohio St. 440, 31 N. E. 658, 16 L. R. A. 611, 34 Am. St. Rep. 573, the fifth headnote (in Ohio the law of the case) says:

"The making and filing, for the purpose of profit, of articles of incorporation in the office of the secretary of state, do not make an incorporated company; such articles are simply authority to do so. No company exists within the meaning of the statute, until the requisite stock has been subscribed and paid in, and the directors chosen."

This was taken bodily from the opinion of Judge Minshall. That he and the court did not intend to overrule the previous decisions is clear, from the fact that they were not referred to in the opinion, and the subject-matter of the case did not require so broad a declaration. The statute referred to reads:

"When by the laws of any other state or nation, any taxes, fines, penalties, license fees, deposits of money or of securities or other obligations or prohibitions are imposed on *insurance companies of this state doing business in such state* or nation, or upon their agents therein, so long as such laws continue in force, the same obligations and prohibitions, of whatever kind, shall be imposed upon all insurance companies of such other state or nation doing busi-

ness within this state, and upon their agents here." (Italics in the opinion.) 49 Ohio St. 444, 31 N. E. 659, 16 L. R. A. 611, 34 Am. St. Rep. 573.

To proceedings in quo warranto, the respondent, a corporation of New York with authority to deal in four lines of insurance, answered, when charged that by the laws of New York no Ohio insurance company could transact business in that state in more than one line of insurance, that it had power in New York to deal in four lines of insurance and that an Ohio company could legally be formed with power to do the same, but that no such company had been formed and hence no application could be made in New York to do the four lines of insurance there. The relator replied that the requisite number of persons subscribed and acknowledged articles of incorporation to do the four kinds of insurance in Ohio; that the articles had been approved by the Attorney General and were recorded in the office of the Secretary of State of Ohio, "whereby," it was averred (49 Ohio St. 443, 31 N. E. 659, 16 L. R. A. 611, 34 Am. St. Rep. 573), "an Ohio corporation was duly and legally formed for the purpose of doing the lines of insurance mentioned in the articles of incorporation."

Of course, such a corporation was not doing business in Ohio, and, as a company doing business, had no existence. The headnotes are not to be given general application, but are to be read in connection with the facts appearing in the report. Witte v. Lockwood, 39 Ohio St. 141, 145; Sherard v. Lindsay, Treas., 13 Ohio Cir. Ct. R. 315, 321; Adelbert College v. Wabash R. R. Co., 171 Fed. 805, 812, 96 C. C. A. 465, 17 Ann. Cas. 1204 (C. C. A. 6); Ohio Tax Cases, 232 U. S. 576, 577, 589, 34 Sup. Ct. 372, 58 L. Ed. 737.

It is quite clear that as late as 1905 (Telephone Co. v. Cincinnati, 73 Ohio St. 64, 76 N. E. 392), the Supreme Court of Ohio regarded Powers v. Railway Co., 33 Ohio St. 429, as still the law. See first headnote, and the opinion of Judge Spear, 73 Ohio St. at page 77.

The opinion of Judge Johnson in the recent case of Parkside Cemetery Ass'n v. C. B. & G. L. Traction Co., 112 N. E. 596 (decided by the Supreme Court of Ohio, December 7, 1915), would seem to indicate that he intended to leave no doubt that in Ohio the filing of articles of incorporation does not create a corporation. The action was for the appropriation of private property for construction of a railroad, and the existence of the plaintiff corporation was directly in issue under the statute providing for the exercise by a railroad of the right of eminent domain. Section 11046, defining the duty of the court, provides:

" * * * The probate judge shall hear and determine the questions of the existence of the corporation, its right to make the appropriation, its inability to agree with the owner, and the necessity for the appropriation. Upon all these questions the burden of proof shall be upon the corporation, and any interested person shall be heard."

The facts are set out in the opinion of the court:

"In this case the formal details such as the preparation and filing of the articles of incorporation, the signing of waivers of notice, the opening of books of subscription, the filing of a certificate of subscription with the secretary of state and the waiver of notice of stockholders' meeting, election of directors,

are all set out in the minute book. But it is shown by the testimony of directors themselves and the secretary and treasurer that the company never kept any books of account, never had any bank account, there was no certificate book, or other books, except the minute book, the shares were written on blanks, which were unnumbered and unidentified and there was no statement on them of the authorized capital stock. One of the incorporators, who was a director, testified that after the certificate of incorporation was received, he paid in the sum of $1,000, which was ten per cent. of the authorized capital stock of the company, but the treasurer testified that there were no books or papers which showed that the director referred to had paid the money to the company for this stock and that he had nothing to show for that. The other·directors admit that they never paid for any shares of stock and some say that after they received them they indorsed them in blank and handed them back to the party from whom they received them. With the exception of the bare statement of Mr. Smartt that he had paid the $1,000 referred to, no payment on any stock is shown and it is not shown what was done with the $1,000 referred to, nor to whom it was paid. The only stock that was ever subscribed for was that originally made by the five incorporators, who each subscribed for two shares of $100 each. These steps and the original resolution of necessity were taken in 1906, and no further action is shown until the filing of the petition in this case in May, 1911.

"The original directors resigned, one after another, as directors and officers and their places were filled by others, who likewise admit that the same stock was given to them without any payment being made by them."

It was held, among other things, that the plaintiff was a "dummy" corporation, and that testimony offered by the defendant which tended to show that the plaintiff company was endeavoring to acquire the right of way for the sole use and benefit of the Northern Ohio Traction & Light Company, and that the latter company had furnished considerable of the money, and, as it was claimed, all of the money that the plaintiff ever had, ought to have been admitted.

We might agree, for the purposes of this case, that on those facts and that evidence there was no proper subscription to the capital stock and no proper qualification of directors; that the plaintiff was a "dummy" corporation acting for another and had no power to appropriate private property; that it had no existence as a corporation with power to appropriate another's land, and that all corporate forms, including the filing of the articles of incorporation, might be disregarded to protect the land owner from an unlawful and unauthorized appropriation of his land. It was not necessary in that case for the court to go further than that, and it is not probable they intended to do so; but the third headnote in the case reads:

"The statutory requirements provided by section 8632 et seq., General Code, for the creation of a corporation are mandatory and must be complied with before the corporation can be in existence."

These sections have to do with the subscriptions to the capital stock and the initial payments thereon, the election of directors, etc., and, if the language of the headnote is restrained to the nature of the action and the facts, and the theretofore declaration of the court of the necessity of compliance with the statutory requirements in those behalfs as a condition precedent to the exercise of the power of eminent domain, we are in hearty accord. But the case did not call for the sweeping language of the headnote, and would have been satisfied if

the words "for the purpose of appropriating private property," or words of like import, had been added.

By the Ohio decisions the "existence" of a corporation under general laws, and the "existence" of a corporation with special power to appropriate private property, are not the same. The Supreme Court of Ohio had before it, in the recent case, the meaning of the word as used in the latter class of cases.

[5] Required, as we are, to follow the decisions of the court of last resort in a state in their construction of the laws of that state, the Constitution, laws and treaties of the United States not being involved (Secombe v. Railroad Co., 23 Wall. 108, 117, 23 L. Ed. 67; Flash v. Conn., 109 U. S. 371, 379, 3 Sup. Ct. 263, 27 L. Ed. 966; Jellenik v. Huron Copper Min. Co., 177 U. S. 1, 12, 13, 20 Sup. Ct. 559, 44 L. Ed. 647), and finding language in the later cases irreconcilable with former decisions, we are relieved from embarrassment by applying the rule established by the Supreme Court of Ohio of harmonizing the decisions, attributing the declaration of law in a case to the facts in it and to the kind of case it is, and denying the application of such declaration to cases involving different situations and requirements.

That the Supreme Court of Ohio did not intend the declaration in the third headnote of Cemetery Co. v. Traction Co. to be a hard and fast rule covering all cases and circumstances, is shown, not only by their failure to refer to the express declaration of the statute as to when a corporation is formed with power to sue, and to their former decisions; but also by omitting any reference to de facto corporations. The doctrine relative to these and their power to maintain a suit, their inviolability from attack except by the state creating them, and then only in a direct proceeding, is established by a wealth of authority. It will be sufficient to refer to a few cases in the courts of the United States. Lessee of Frost v. Frostburg Coal Co., 24 How. 278, 16 L. Ed. 637; Baltimore, etc., R. R. Co. v. Fifth Baptist Church, 137 U. S. 568, 571, 11 Sup. Ct. 185, 34 L. Ed. 784; Shapleigh v. San Angelo, 167 U. S. 646, 656, 17 Sup. Ct. 957, 42 L. Ed. 310; Miller v. Perris Irrigation Dist., 85 Fed. 693, 698 (C. C.); Id., 99 Fed. 143, 150 (C. C.); Herring v. Modesto Irr. Dist., 95 Fed. 705, 717, et seq. (C. C.); Telegraph Co. v. Railroad Co., 114 Fed. 787 (C. C.); and in this circuit: Farmers', etc., Co. v. Toledo, etc., Ry. Co., 67 Fed. 49, 55 (C. C.); Continental Trust Co. v. Toledo, etc., R. Co., 82 Fed. 642, 649 (C. C.).

If, in Ohio, a corporation with general powers has no existence at all unless the laws relative to subscription and payment for stock and the election and qualification of directors are strictly complied with, the doctrine of de facto corporations universally recognized in the United States, and, for justice' sake, frequently applied, has no further place in the Ohio law. It is inconceivable that Judge Johnson, who wrote the opinion in Cemetery Co. v. Traction Co., and the court concurring in the headnotes of it, intended to overthrow that just and salutary doctrine, particularly as they did not even refer to the leading case of Society Perun v. Cleveland, 43 Ohio St. 481, 490, 3 N. E. 357, 360, in which it was said by Judge Owen:

"The theory that a *de facto* corporation has no real existence, that it is a mere phantom, to be invoked only by that rule of estoppel which forbids a party who has dealt with a pretended corporation to deny its corporate existence, has no foundation, either in reason or authority. A *de facto* corporation is a reality. It has an actual and substantial legal existence. It is, as the term implies, *a corporation.*"

The infirmity in that case lay in the very articles themselves; and before the case was decided a judgment of ouster was rendered against the corporation in quo warranto proceedings.

While we might agree that in Ohio three corporations cannot form a corporation in the sense that they may become the incorporators, yet no reason appears why three corporations, or one corporation, may not, for legitimate purposes, cause a corporation to be formed under the laws of that state through agents selected for the purpose. The theory of separate entity of a corporation is not disturbed by the ownership of all of its stock by another corporation. Peterson v. Chicago, etc., Ry. Co., 205 U. S. 364, 391, 27 Sup. Ct. 513, 51 L. Ed. 841; Richmond, etc., Co. v. Richmond, etc., Co., 68 Fed. 105, 108, 15 C. C. A. 289, 34 L. R. A. 625 (C. C. A. 6th Cir.); Commonwealth v. Monongahela Bridge Co., 216 Pa. 108, 114, 64 Atl. 909, 8 Ann. Cas. 1073; Louisville Gas Co. v. Kaufman, 105 Ky. 131, 158, 48 S. W. 434 et seq. There is no requirement in the law, nor any inference to be drawn from it, that the incorporators of an Ohio corporation must have any financial interest or benefit of any kind in the incorporation sought. The general understanding in Ohio on the subject is found in 1 Couse's Ohio Private Corporations, § 16. In some jurisdictions, incorporators are directly held to be mere instruments of the law for purposes of preliminary organization. Densmore Oil Co. v. Densmore, 64 Pa. 43, 54; Chase v. Lord, 77 N. Y. 1, 11; Bristol Bank v. Jonesboro, etc., Co., 101 Tenn. 545, 553, 48 S. W. 228; 1 Clark & Marshall on Private Corporations, § 45.

Incorporators, after filing the articles, open books for subscription. When 10 per cent. of the capital stock has been subscribed and 10 per cent. of the subscription paid in, and they have so certified, their duties come to an end. There is no requirement that they shall subscribe to the capital stock, though if they do so, they make themselves personally liable to the corporation (Henkle v. Salem Mfg. Co., 39 Ohio St. 547, 552; Trust Co. v. Floyd, 47 Ohio St. 525, 541, 26 N. E. 110 et seq.; Pullman v. Upton, 96 U. S. 328, 330, 24 L. Ed. 818); and if there is any deficiency in the amount of the actual payment of 10 per cent. on the stock subscribed at the time they have certified the fact, they are liable to any person affected thereby (section 8634, Gen. Code Ohio).

[6] Permission is now given to private corporations in Ohio to "purchase, or otherwise acquire, and hold shares of stock in other kindred but not competing private corporations." Section 8683, Gen. Code Ohio. Whether or not under such permission a corporation could itself become a subscriber, it is not necessary to decide; but under authority elsewhere (Oregon, etc., R. Co. v. Postal Tel. Cab. Co., 111

Fed. 842, 49 C. C. A. 663 [C. C. A. 9]; National Docks Ry. Co. v. Cent. R. Co., 32 N. J. Eq. 755, overruling 31 N. J. Eq. 475, 478, wherein the facts appear; Lower v. C., B. & Q. R. Co., 59 Iowa, 563, 13 N. W. 718; Postal Tel. Cab. Co. v. Railway Co., 23 Utah, 474, 481, 65 Pac. 735, 90 Am. St. Rep. 705) and from the views expressed in Cemetery Co. v. Traction Co., we hold, for the purpose of this case, that in Ohio, no fraud appearing, the representatives of a corporation may subscribe for it to the capital stock of another corporation caused by it to be formed through them. It was there said by Judge Johnson:

"* * * It is no objection that the organization of a plaintiff corporation was promoted or procured by another corporation, or its stockholders, which is specially interested in the enterprise for which the plaintiff was formed and which could not condemn property in furtherance of such enterprise and such matters cannot be set up in answer to the plaintiff's petition to condemn."

Also:

"One who has subscribed and paid for or who has purchased stock in a corporation has of course the right to make a bona fide gift of it, and in such case the donee's title is perfect. And doubtless the originator of a corporation organized in good faith to carry out the purposes stated in its articles, may properly procure the requisite number of signatures to all of the preliminary instruments, including the necessary ten per cent. stock subscription, by making an executed bona fide gift to each of the amount necessary to pay the required portion of the subscriptions into the treasury. * * *"

The "preliminary instruments" are necessarily the articles.

[7] That a director may obtain his stock by gift, or hold it upon a trust, and be legally qualified, is not open to question. People v. Lihme, 269 Ill. 351, 109 N. E. 1051, 1054; Gas Co. v. Kaufman, 105 Ky. 131, 159, 48 S. W. 434. If it were on a secret agreement with the company without consideration as a qualification to be a director, the stock to be surrendered on demand, as in Dueber Watch Case Mfg. Co. v. Daugherty, 62 Ohio St. 589, 57 N. E. 455; or for a dishonest purpose, or as a shield for wrongdoing, then, of course, the title of a director may be impeached. In the matter of St. Lawrence Steamboat Co., 44 N. J. Law, 529, 541; Louisville Gas Co. v. Kaufman, etc., Co., 105 Ky. 131, 159, 48 S. W. 434; In re Leslie, 58 N. J. Law, 609, 33 Atl. 954; Bartholomew v. Bentley, 1 Ohio St. 37; De Ruvigney's Case, 5 Ch. 307, 322.

If there was a want of compliance with the law in the organization of the Kardo Company, it lay in the fact that while the subscriptions of the five agents, who were the incorporators, were paid to the corporation, yet the subscribers were not, nor were they intended to be, the owners of the stock; and in the resulting claim that, since directors must be elected by stockholders, their election as directors had not sufficient foundation. Necessarily, the substitution for each of these of other representatives of the three corporations could not be regarded as a proper election of directors. If the five shares subscribed by the original agents of the promoters had been given to them, a different situation would be presented; but we see no reason why they cannot be regarded, in this subscription, as agents

for the promoters, their 10 per cent. subscriptions being actually paid in money.

Theoretically, no doubt, a corporation, a creature of the state, has only complete existence when the laws giving it being are complied with. But that theory, carried to its logical conclusion, would, in many cases, result in such injustice that the courts, established for the purpose of doing justice, have found a way by which the justice of the particular case may be worked out without really doing violence to logic. This they do by denying to a party to a suit the right to raise the question of corporate capacity of the plaintiff to sue when injustice would result and when considerations of public policy are involved; so that the Kardo Company, while it may not be strictly a corporation de jure, may nevertheless have a status in the law sufficient to enable it to protect itself from a wrongdoer who seeks to escape his wrongdoing on the ground of its failure to comply with every detail of the law under which it was sought to be organized and because the method of its formation could not be recognized by the state as a compliance with the law on the subject. This is a matter with which one who has done it a wrong has no concern. To so hold is not judicial legislation. The court makes no attempt to create the plaintiff a corporation. The courts, in the interests of justice, will not permit one who ought not to deny the plaintiff's corporate existence, to do so.

So far as the conduct and purposes of the promoters, the incorporators, or the directors of the Kardo Company, are concerned, every step taken, both by intention and by results, was marked by absolute good faith. This is a vital fact. The case has no resemblance to Bank v. Trebein, 59 Ohio St. 316, 52 N. E. 834, in which the formation of the corporation necessarily resulted in fraud of creditors not in the scheme; nor to Andres v. Morgan, 62 Ohio St. 236, 245, 56 N. E. 875, 78 Am. St. Rep. 712, in which it was held that the mere transfer of partnership interests into the same proportional shares of stock in a corporation formed by partners, would be a fraud on creditors of the partnership. Here nobody was injured, or could be injured, by what was done, or by the failure to follow the law in detail. The wrong done, if any, was to the state, which has not seen fit to interfere.

Nor does the case present facts appropriate for the application of the rule that equity will look through the forms of things to their substance. It is an ancient doctrine, applied in recent years to corporations. The cases are numerous. It will be sufficient to refer to some in the courts of the United States, and in the Supreme Court of Ohio: McCaskill v. United States, 216 U. S. 504, 30 Sup. Ct. 386, 54 L. Ed. 590; B. & O. Tel. Co. v. Interstate Tel. Co., 54 Fed. 50, 4 C. C. A. 184 (C. C. A. 4th Cir.); In re Muncie Pulp Co., 139 Fed. 546, 71 C. C. A. 530 (C. C. A. 2d Cir.); Gay v. Hudson River, etc., Co., 187 Fed. 12, 109 C. C. A. 66 (C. C. A. 2d Cir.); Hunter v. Baker, 190 Fed. 665 (C. C.); Hunnewell v. N. Y. Cent. & H. R. R. Co., 196 Fed. 543 (C. C.); Smith v. Moore, 199 Fed. 689, 118 C. C. A. 127 (C. C. A. 9th Cir.); Volksblatt Co. v. Hoffmeister, 62 Ohio St. 189, 56 N. E. 1033, 48 L. R. A. 732, 78 Am. St. Rep. 707; Andres v. Morgan, 62 Ohio St. 236, 56 N. E. 875, 78 Am. St. Rep. 712; Park-

side Cemetery Ass'n v. Traction Co., 112 N. E. 596, decided by the Supreme Court of Ohio, December 7, 1915. The general subject is comprehended within the short statement of Judge Sater in the case of In re Rieger, 157 Fed. 609, 613 (D. C.):

"The doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case ignore it to preserve the rights of innocent parties or to circumvent fraud."

To this might be added: In actions to appropriate private property in Ohio under the power of eminent domain, when the existence of the corporation for such purpose is in issue, as in Cemetery Co. v. Traction Co., the court will look through corporate forms to ascertain the real party in interest, when that also is made an issue in the case; for it would be unjust to invade the right of private property for public use unless the corporation, seeking to exercise the power, had the power and was the real party in interest. To prevent injustice the rule has been applied also in cases in which one corporation is a mere adjunct or agency of another. In re Watertown Paper Co., 169 Fed. 252, 256, 94 C. C. A. 528 (C. C. A. 2d Cir.); In re Muncie Pulp Co., 139 Fed. 546, 548, 71 C. C. A. 530 (C. C. A. 2d Cir.); B. & O. Tel. Co. v. Interstate Tel. Co., 54 Fed. 50, 54, 4 C. C. A. 184 (C. C. A. 4th Cir.); Hunter v. Baker, 190 Fed. 665, 668 (C. C.); In re Rieger, 157 Fed. 609, 613 (C. C.).

[8] Courts of equity will not permit corporate forms to be used as a shield for injustice and wrongdoing, or to illegally appropriate private property; but we have found no case, and we think none exists, in which a court has brushed aside corporate forms at the instance and for the benefit of one who has done the corporation a wrong. To such a case the rule has no application.

It appearing that the three corporations could promote the formation of another corporation; that the purpose of incorporation was legitimate; that proper articles were filed with the Secretary of State; that 10 per cent. of the capital stock was subscribed, and one-tenth of that paid in, and $20,000 more; that the corporation for eight months attempted to license its patents and to protect them had brought this and two other suits; that it had a seal and was equipped to carry on its business; that no wrong has been perpetrated, or sought to be perpetrated, we think the various elements of a corporation de facto are present, as defined by the courts of the United States. In Tulare Irrigation District v. Shepard, 185 U. S. 1, 13, 22 Sup. Ct. 531, 536 (46 L. Ed. 773), it was said by Mr. Justice Peckham:

"From the authorities, some of which are above cited, it appears that the requisites to constitute a corporation de facto are three: (1) A charter or general law under which such a corporation as it purports to be might lawfully be organized; (2) an attempt to organize thereunder; and (3) actual user of the corporate franchise."

In Toledo, etc., R. Co. v. Continental Trust Co., 95 Fed. 497, 508, 36 C. C. A. 155, 167, it was said by Judge Lurton, speaking for this court:

"The test of a de facto corporation is this: Was there a law under which there might have been a de jure corporation of the kind, character, and class to which the organization in question apparently belongs? It is the apparent legality of the organization which gives it its de facto character."

Judge Taft, in Continental Trust Co. v. Toledo, etc., R. Co., 82 Fed. 642, 650 (C. C.), said:

" * * * it may be safely stated as the rule that when persons assume to act as a body, and are permitted by acquiescence of the public and the state to act, as if they were legally a particular kind of corporation, for the organization, existence, and continuance of which there is express recognition by general law, such body of persons is a corporation de facto, although the particular persons thus exercising the franchise of being a corporation may have been ineligible and incapacitated by the law to do so."

[9] When the fact of the existence of a corporation de facto is established, it is the settled law that its existence de jure cannot be collaterally attacked; that is, by any other than the state under whose laws its formation was sought, and only then in a direct proceeding. The cases are legion. 1 Thompson on Corporations (2d Ed.) § 248. A number in the courts of the United States may be cited: Frost v. Frostburg Coal Co., 24 How. 278, 283, 284, 16 L. Ed. 637; Smith v. Sheeley, 12 Wall. 358, 361, 20 L. Ed. 430; Commissioner v. Bolles, 94 U. S. 104, 106, 24 L. Ed. 46; Pullman v. Upton, 96 U. S. 328, 329, 24 L. Ed. 818; Bank v. Matthews, 98 U. S. 621, 628, 25 L. Ed. 188; Close v. Glenwood Cemetery, 107 U. S. 466, 477, 2 Sup. Ct. 267, 27 L. Ed. 408; Removal Cases, 115 U. S. 1, 15, 16, 5 Sup. Ct. 1113, 29 L. Ed. 319; Railroad v. Baptist Church, 137 U. S. 568, 571, 572, 11 Sup. Ct. 185, 34 L. Ed. 784; Dallas County v. Huidekoper, 154 U. S. 654, 14 Sup. Ct. 1190, 25 L. Ed. 974; Shapleigh v. San Angelo, 167 U. S. 646, 655, 656, 17 Sup. Ct. 967, 42 L. Ed. 310; Ashley v. Supervisors, 60 Fed. 55, 63, 8 C. C. A. 455 (C. C. A. 6th Cir.); American, etc., Ry. Co. v. Mayor (C. C.) 68 Fed. 227, 228; Andrews v. National, etc., Works, 77 Fed. 774, 778, 23 C. C. A. 454, 36 L. R. A. 153 (C. C. A. 7th Cir.); Deitch v. Staub, 115 Fed. 309, 315, 53 C. C. A. 137 (C. C. A. 6th Cir.).

The decisions withholding permission from a party other than the state to deny corporate existence and capacity to sue, rest upon different grounds depending upon the nature of the case. One such ground is estoppel. The cases are numerous. A few illustrations may be taken from decisions of the United States courts. One dealing, or contracting, with a corporation, as such, may not deny its existence (Close v. Glenwood Cemetery, 107 U. S. 466, 2 Sup. Ct. 267, 27 L. Ed. 408; Andes v. Ely, 158 U. S. 312, 322, 15 Sup. Ct. 954, 39 L. Ed. 996; New Orleans, etc., Co. v. Louisiana, 180 U. S. 320, 328, 21 Sup. Ct. 378, 45 L. Ed. 550; Toledo, etc., Co. v. Trust Co., 95 Fed. 497, 507, 36 C. C. A. 155 [C. C. A. 6th Cir.]); a debtor may not (Harris v. Runnels, 12 How. *79, 13 L. Ed. 901); a subscriber to the capital stock may not (Chubb v. Upton, 95 U. S. 665, 24 L. Ed. 523; Dallas County v. Huidekoper, 154 U. S. 654, 14 Sup. Ct. 1190, 25 L. Ed. 974); but the cases also show that the doctrine does not by any means rest only upon estoppel. The Supreme Court of Ohio in Society Perun v. Hay, 43 Ohio St. 481, 498, 3 N. E. 357, 364, repudiated the claim that when

*estoppel* cannot be invoked, there can be no de facto corporation, and say, with respect to that corporation:

"The highest considerations of public policy and fair dealing protest against treating such an organization as a nullity and all of its transactions void."

Many other decisions are expressly based on "public policy" and "principles of plain justice." These may undoubtedly blend into each other, if, indeed, estoppel does not also partake of their characteristics. It is difficult to define public policy. It will be sufficient to say that the public policy of a state will be found in the Constitution, statutes, and the decisions of its highest courts. Vidal v. Girrard, Executors, 2 How. 126, 197, 198, 11 L. Ed. 205; Insurance Co. v. Railway, 175 U. S. 91, 100, 20 Sup. Ct. 33, 44 L. Ed. 84; License Tax Cases, 5 Wall. 462, 469, 18 L. Ed. 497.

The courts have declined in innumerable instances to enforce contracts which are against public welfare, as, for instance, contracts in restraint of trade, and contracts contra bonos mores. The common law "prohibits everything which is unjust or *contra bonos mores.*" Mr. Justice Wayne in Harris v. Runnels, 12 How. *79, *83, 13 L. Ed. 901. That term may be difficult of definition applicable to all cases; but there can be no doubt that when conduct is of such character as to offend the average conscience, as involving injustice according to commonly accepted standards, it is contra bonos mores. This must be true, not only when parties are contractually dealing with each other, but also when a stranger, having wronged a corporation de facto, seeks to escape the penalty invoked in a court of justice by denying the right of such corporation to maintain the suit because of informalities in its organization. To such conduct, a court of justice will not give its sanction, and it is quite immaterial whether the denial is placed on grounds of public policy or upon principles of plain justice, or upon both of these.

We are not, however, left in doubt as to the public policy of the United States on this subject, as declared by the Supreme Court. Baltimore, etc., R. R. Co. v. Fifth Baptist Church, and another case of the same title, 137 U. S. 568, 571, 572, 11 Sup. Ct. 185, 186 (34 L. Ed. 784), were in their nature actions on the case for damages for the continuance of a nuisance to the church's use and enjoyment of its house of public worship by the noise, smoke, cinders, ashes and vapors from the railroad's adjoining engine house, repair shops and locomotives, and by the obstruction of access to its building by the railroad's unlawful use of a sidetrack in front of it. It was held, Mr. Justice Gray speaking for the court—

"that the plaintiff had in good faith legally organized as a corporation and had long acted as such and was at least a corporation *de facto*, which is all that is necessary to enable it to maintain an action against any one, other than the state, who has contracted with the corporation or who has done it a wrong."

The case did not rest upon any rule of estoppel, but upon the ground that the defendant was a wrongdoer and as such could not raise the question of the injured party's corporate capacity.

Other decisions may be found directly to the point, in some of which there is an express declaration that the decision does not rest upon estoppel, but upon public policy and principles of plain justice. Trustees, etc., v. Froslie, 37 Minn. 447, 451, 35 N. W. 260, 262, was an action in ejectment. It was there said:

"And in an action by it (the corporation) to recover such property, no private person will be allowed to inquire collaterally into the regularity of its organization. This rule is not founded upon any principle of estoppel, as is sometimes assumed, but upon the broader principles of common justice and public policy. It would be unjust and intolerable if, under such circumstances, every interloper and intruder were allowed thus to take advantage of every informality or irregularity of organization."

In Stockton, etc., Road Co. v. Stockton, etc., Railroad Co., 45 Cal. 680, the defendant was a trespasser. Persse, etc., Works v. Willett, 1 Robertson (24 N. Y. Super. Ct.) 131, was an action for damages for conversion. Denver v. Mullen, 7 Colo. 345, 3 Pac. 693, was a suit for injunction against interference with the plaintiff's water rights. In Turnpike Co. v. Cutler, 6 Vt. *315, *323, an action on the case for trespass, it was said by Judge Phelps:

"The existence of a corporation *de facto* is always sufficient for the ordinary purpose of protecting the corporate rights against a stranger."

A bill in equity lies against a stranger seeking to interfere with the property of a de facto corporation. Railroad Co. v. Railway Co., 75 Ill. 113, 117.

The rule was applied to patent cases in Young, etc., Co. v. Young, etc., Co., 72 Fed. 62 (C. C.), a decision by Judge Acheson, and American Cable Ry. Co. v. Mayor, 68 Fed. 227 (C. C.), the complainants in each claiming to be corporations and seeking to restrain the infringement of a patent, the defendant denying the complainant's capacity to sue. In the latter case it was said by Judge Wheeler (68 Fed. 228):

"The corporation was organized, and took the title to this patent, which seems to be within the scope of its corporate powers. No proceedings have been taken to terminate it. Under these circumstances, it seems to exist, so far at least as to be able to maintain this suit against wrongdoers for trespassing upon this corporate property."

[10] From these authorities, and upon principle, the rule may be deduced that a wrongdoer will not be permitted to deny the capacity of a de facto corporation suing him to redress the wrong. The de facto corporation exists de jure as to him, and in such suit it is the real party in interest. So far as the defendant is concerned, there can be no party in interest but the Kardo Company. Even in cases in which all the stock of a corporation is owned by one person or another corporation, the corporate rights are distinct from the rights of stockholders, as hereinbefore shown. And when the cause of action relates to property and property rights, of which the corporation is vested with the legal title, the corporation is the real party in interest. Railroad Co. v. Railroad Co., 23 Minn. 359.

The assignment of a patent must be acknowledged before an officer, and, to be valid as against subsequent purchasers or mortgagees for a valuable consideration without notice, must be recorded in the patent

office within three months from its date. 4 U. S. Comp. Stat. 1913, p. 4297, § 9444. The record shows the assignment of the patent owned by the American Ball Bearing Company to the Kardo Company, but does not seem to disclose assignments from the other two corporations of their patents to the Kardo Company. Those assignments may, for present purposes, be assumed to have been executed with the formalities required by the statute and recorded in the patent office. The title to the patents would, no doubt, pass as completely by the written and recorded assignments as would real estate by deed, and, by analogy, the effect of such assignment would be the same as conveyances of real estate. It is an established principle that even when a corporation is incompetent by its charter to take title to real estate, a conveyance to it is not void but only voidable, and its validity can be assailed only by the state creating it in a direct proceeding instituted for the purpose. Bank v. Matthews, 98 U. S. 621, 628, 25 L. Ed. 188. One who has made a sale of real estate to a de facto corporation, consideration being paid, is not in a position to question the corporation's capacity to take the title (Smith v. Sheeley, 12 Wall. 361, 20 L. Ed. 430); and such conveyance is valid and binding as against all parties but the state (Doyle v. San Diego, etc., Co., 46 Fed. 709, 711 [C. C.]). Since the three corporations, as stockholders and as assignors, and since the Kardo Company, as assignee, could not be heard to deny the title of the Kardo Company to the patent in suit, there is no other party in interest, and the defendant could not be subjected to any other suit to restrain the infringement, if he has infringed; and he is in no position to deny the reality of the Kardo Company's interest in the suit.

The discussion should not, however, end without reference to Zanesville v. Gaslight Co., 47 Ohio St. 1, 23 N. E. 55, in which the second headnote reads:

"Whenever an incorporated company, in any action, asserts a right against another person based upon an assumed franchise or power, the person against whom the right is so asserted may, as a defense, deny the existence of such franchise or power."

The basis of the Gas Company's action was its assumed power to fix rates. Its special charter was silent on the subject. The power was denied because it was not expressly granted and not necessarily incidental to the exercise of expressed powers. It will be seen at once that the principle underlying the case has no resemblance to the principle here involved. One has to do with the subject ultra vires, and the other with the doctrine of de facto corporations. The Gas Company was a corporation de jure, seeking to exercise powers it did not have. The Kardo Company is a corporation at least de facto, seeking to exercise powers which it would have if a corporation de jure. There is no similitude between an attempt by a de jure corporation to exercise a corporate franchise it never had, and an attempt by a de facto corporation to protect itself against a wrongdoer when the corporation would be de jure with ample power were it not for irregularities and informalities in its organization. It is said in 4 Thompson on Corporations (1st Ed.) § 5651:

"If a corporation exists *de facto* * * * then the law will ascribe to it all the powers which it would have possessed if it had been regularly organized. And this will include all those powers which are ascribed, by implication of law, to corporations generally; such as the power to make and take contracts, acquire and transmit property, sue and be sued, etc."

This principle is illustrated by its application to contractual relations, concerning which it was said by Mr. Justice Gray in Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 60, 11 Sup. Ct. 478, 488 (35 L. Ed. 55):

"When a corporation is acting within the general scope of the powers conferred upon it by the legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities which are prerequisites to its existence or to its action, because such requisites might in fact have been complied with. But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation, nor the other party to the contract, can be estopped, by assenting to it, or by acting upon it, to show that it was prohibited by those laws."

Corporations acting ultra vires may not defend on that ground against a tort committed by its agents. 5 Thompson on Corporations (1st Ed.) § 5993. And even against such corporations, one whose rights are not injuriously affected will not be permitted to complain. Of such an one it was said by Mr. Justice Matthews, in Railroad v. Ellerman, 105 U. S. 166, 174 (26 L. Ed. 1015):

"The only injury of which he can be heard in a judicial tribunal to complain is the invasion of some legal or equitable right. * * * If he alleges that the railroad company is acting beyond the warrant of the law, the answer is, that a violation of its charter does not of itself injuriously affect any of his rights. The company is not shown to owe him any duty which it has not performed."

In Zaneszille v. Gaslight Co., since the business of furnishing gas to a city was impressed with a public use, and, therefore, subject to regulation of rates by the city through ordinances to that end, sanctioned by the Legislature, the suit of the Gas Company was an effort under power which did not exist to deprive the city of legal rights. Of course, the city could defend against such usurpation of power. The case has no application here.

The conclusion is that this case is not one for the independent inquiry by a trial judge, on his own motion, and without the issues being raised by the pleadings, into the complainant's corporate capacity, or the reality of its interest, and that, if those issues are made by amendment, the defendant cannot be heard to defend, on those grounds, the Kardo Company's action for the infringement of its patent.

The decree below will be reversed, at defendant's costs, and the cause remanded for further proceedings not inconsistent with this opinion.